UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MICHAEL VARVARO,**

          **Plaintiff,**

**v.**                              **Case No: 6:21-cv-329-PGB-LHP**

**UNIVERSITY OF CENTRAL
FLORIDA BOARD OF
TRUSTEES,**

          **Defendant.**

_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Summary Judgment, Motion to Dismiss and Memorandum in Support Thereof (Doc. 25 (the "**Motion**")), filed May 2, 2022.[1]  Plaintiff responded in opposition on May 27, 2022 (Doc. 32); Defendant replied on June 9, 2022 (Doc. 33).  Upon consideration and review of the record, the Court grants in part and denies in part Defendant's Motion.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff, Dr. Michael Varvaro, was employed in the University of Central Florida's ("**UCF**") Residency Program as a resident from the summer of 2017 until

---

[1]  As will be explained further below and based on the law cited by the Plaintiff (Doc. 25, p. 3) and the procedural posture of the case, the Court treats Defendant's Motion as a Motion for Summary Judgment.

October 2019. The Residency Program endeavors to comport with the standards set forth by the Accreditation Council for Graduate Medical Education ("**ACGME**") in Family Medicine. (Doc. 27, p. 2). Each year fewer than ten physicians are admitted to the Residency Program. (*Id.* at pp. 2–3). Included in the requirements for these residents is a minimum number of "patient encounters" that a resident must meet. (*Id.* at p. 7). Dr. Varvaro is blind in one eye and suffers from a reading disability as a result. (*Id.* at p. 4). Neither party disputes that Dr. Varvaro is disabled and part of a protected class. (Doc. 25, p. 5).

This lawsuit arises out of a dispute as to why Plaintiff's Medical Resident Agreement program was not renewed in October 2019. (*Id.* at p. 4). Plaintiff claims that he was harassed, discriminated against, and effectively forced to resign from the program because of his disability, whereas Defendant states that it did not renew Plaintiff's Medical Agreement Contract because of Plaintiff's failure to meet the program's conditions of employment and repeated concerns with his clinical performance in the ambulatory clinic. (Doc. 2, p. 2; Doc. 25, pp. 2–4). The Agreement states that an unsatisfactory evaluation can result in remediation, suspension, non-renewal of appointment or termination from the program. (Doc. 27, p. 17).

In his sworn testimony, Plaintiff indicates that he has received disability accommodations from grade school to medical school and that he again requested these accommodations in August 2017 during his first year of residency. (Doc. 32-1, pp. 1–2). These accommodations include additional time on exams, quiet

environments for exams, extended time to complete notes, reduced distraction environments, enlarged print, alternate formatting of material, note-taking, and preferred seating. (*Id.* at p. 1).

Plaintiff testifies that, in tandem with his lack of accommodations, he experienced a hostile work environment: his supervisors made Plaintiff feel as though he was being assessed based on his speed, yelled at him, and treated him as though he was intentionally not trying. (*Id.* at pp. 2–3). Plaintiff further testifies that his supervisors generally scrutinized him more heavily and treated him poorly because of his disability. (*Id.* at p. 3). For example, Dr. Sayre, one of the program's supervising physicians, made Plaintiff stand up in front of the entire residency program to talk about his dictation device as an accommodation and that the residents belittled him for his need to use one. (Doc. 32-2, p. 6).[2] Plaintiff also claims that Dr. Lang sent out a program-wide apology email regarding his treatment of Plaintiff. (*Id.*).[3]

Plaintiff testifies that he followed UCF's policy in making these requests by approaching the correct doctor within the program directly and by asking his supervisor in inpatient medicine, Dr. Logan, for said accommodations multiple times but that these accommodations were not initially provided or acknowledged as legitimate and warranted. (*Id.* at p. 3). Specifically, Plaintiff attests that, though

---

[2]   Defendant does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

[3]   Defendant also does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

he did receive extended time for his 2017 In-Training Exam, he did not receive a dictation device or a quiet workspace in advance of the In-Training Exam, which contributed to his failing the ITE Exam. (Doc. 32-1, ¶ 4). Dr. Lang, one of the residency supervisors, attested that he was not aware of any of Plaintiff's requests until he received an email from Plaintiff on June 13, 2018. (Doc. 27, p. 4). The record shows that Plaintiff reached out via text message to Shana Ninan, the Family Medicine Program Coordinator, on September 20, 2017, to request extended time as well as a dictation device in advance of his exam. (*Id.* at pp. 32–34). Ms. Ninan indicated in this exchange that the extended time had been granted but that she was still working on setting up Plaintiff's dictation device. (*Id.* at p. 34). The record contains no evidence that Plaintiff received this device or a quiet workspace for his 2017 exam.

After Plaintiff failed this In-Training Exam, Defendant indicated that it placed Plaintiff on an informal remediation plan in January of 2018 based both on this failure and supervising physicians' concerns over Plaintiff's ability to make proper diagnoses and provide linear and accurate patient presentations as well as his deficiencies in medical knowledge. (*Id.* at p. 3). Ultimately, Plaintiff successfully completed this informal remediation program. (*Id.* at p. 4). For his second In-Training Exam in late 2018, Plaintiff re-submitted his request for accommodations and did receive them; he subsequently earned one of the highest exam scores in the program. (Doc. 32–1, p. 2). The progress report concerning

Plaintiff's scores indicated that he received extra time due to his medical disability. (*Id.*).

In November 2018, the Clinical Competency Committee issued a counseling letter to Plaintiff, showing that he had received five to six unsolicited negative complaints from clinic patients and multiple complaints from clinic staff, including issues with professionalism and using respectful language. (Doc. 27, p. 35). The next month, plaintiff began working on the "night-float" rotation and requested a reduced patient load or a modified work schedule; these requests were denied because the Office of Institutional Equity found that Plaintiff's requests were not reasonable accommodations under the Americans With Disabilities Act (the "**ADA**"). (Doc. 26, p. 162). On top of this, Plaintiff testifies that the residency program instead gave him an increased patient load and told him that he would have to go above and beyond ACGME standards. (Doc. 32-1, p. 4). Plaintiff attested that this patient load was higher than the number of patients received by "any other resident. . . ." (Doc. 32-2, p. 6).[4] Plaintiff also states that he was overly scrutinized and harassed as a result of his slower pace due to his disability. (*Id.* at pp. 3–5). Defendant states that "[a]t all times, decisions regarding Dr. Varvaro's participation in the Residency Program...were made for legitimate, non-discriminatory reasons, solely relating to his failure to meet the conditions, requirements and standards of the Residency Program." (Doc. 27, p. 7).

---

[4] Defendant does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

Shortly thereafter, Plaintiff failed his in-hospital "night-float" rotation: his supervising physician stated in his evaluation that Plaintiff's clinical knowledge and ability to synthesize information was "very far" from expectations and that he had "grave concerns" about whether Plaintiff would be able to care for patients independently in less than two years. (*Id.* at pp. 4–5).

After being placed on a "formal" remediation plan in early 2019, Plaintiff requested and was granted a three-month leave of absence. (Doc. 2-1, p. 4). On or about February 13, 2019, Plaintiff filed a charge with the EEOC. (*Id.* at p. 5).  Upon his return, Defendant placed Plaintiff in the Cardiology rotation. (*Id.*). The UCF/HCA GME Consortium Policy requires that the:

> program director and supervising faculty must provide and document timely feedback on an ongoing basis for trainees including formative 'on-the-spot' and summative feedback. This must include both positive feedback as well as feedback on performance or conduct concerns as they occur. Documentation must appropriately and accurately reflect the feedback provided.

(Doc. 32-1, p. 11). Plaintiff attests that he received no such feedback despite his repeated inquiries into his performance and that his first notice of any failure to meet standards was when he received notice that he had failed the Cardiology rotation in July 2019. (*Id.* at p. 4).[5] Plaintiff also states that, during a clinical competency meeting the following month, Dr. Marcus Tellez—a chief resident attending the meeting—told him that "Dr. Jones hates [him]" and that "she wants

---

[5]   Defendant does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

[him] gone". (Doc. 32-2, p. 6).[6] Defendant then placed Plaintiff on his second remediation plan, which Plaintiff appealed unsuccessfully. (Doc. 26, p. 5). The notice of remediation laid out specific goals that Plaintiff would be required to meet, the failure of which could result in dismissal from the program. (Doc. 27, p. 45).

Though Plaintiff successfully completed his night-float rotation the second time around, Defendant cites multiple deficiencies in his Family Medicine rotation, which Defendant states resulted in the non-renewal of his contract. (Doc. 26, p. 5). Specifically, Defendant points to two documented incidents of failure to administer proper care to two high-risk pediatric patients. (Doc. 27, p. 46). Plaintiff ultimately resigned from the Residency program at the end of 2019. (Doc. 2-1, p. 5). Plaintiff testifies that Defendant offered him the option either to resign, so that he could maintain appeal rights and a clean record, or otherwise to face termination without said benefits. (Doc. 32-1, p. 5). Dr. Lang testified on behalf of Defendant that Plaintiff's contract was not renewed due to his performance in multiple respects and that the decision was for legitimate, non-discriminatory reasons. (Doc. 27, p. 6).

### B.    Procedural Background

The ADA and Florida Civil Rights Act (the "**FCRA**") claims in this case were originally brought in Florida state court on or about December 30, 2020. (Doc. 2,

---

[6]   Defendant does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

p. 1).    Defendants filed for removal on February 11, 2021. (*Id.*). Plaintiff's Complaint asserts four claims for relief against Defendant. (Doc. 2-1, pp. 5–11). Count I asserts a claim for disability discrimination in violation of the FCRA. (*Id.* at p. 5). Count II asserts a claim for disability discrimination under the ADA. (*Id.* at p. 7). Count III asserts a claim for retaliation under the FCRA, (*Id.* at p. 8) and Count VI asserts the same claim under the ADA. (*Id.* at p. 9). Defendant now moves for summary judgment on all four claims. (Doc. 25, p. 1). After Plaintiff's response (Doc. 32) and Defendant's reply (Doc. 33), this matter is ripe for review.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials" but may also consider any other material in the record.  FED. R. CIV. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*  The moving party bears the initial burden of identifying

those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts.  *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court may not grant summary judgment if doing so would be based on witness credibility determination; the Court must accept the non-movant's competent testimony as true for the purposes of ruling on summary judgment. *Johnson v. Lang*, No. 19-14278, 2022 WL 2734421, at *4 (11th Cir. July 14, 2022) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("The district court was correct in observing that it could not consider Edinger's credibility as a witness in ruling upon summary

judgment.");[7] *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (holding that Rule 56(c) precludes summary judgment when the only way to reconcile conflicting testimony is to "assess the credibility of witnesses.").

## III.   DISCUSSION

Plaintiff alleges two counts of disability discrimination and retaliation under both the ADA and the FCRA, respectively. However, Plaintiff alleges facts that the Court believes amount to multiple causes of action under each of these counts: a disparate treatment claim, a hostile work environment claim, a request for reasonable accommodation claim, and a retaliation claim.[8] The Court will address the merits of each separate cause of action at the summary judgment stage in turn.[9]

---

[7]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

[8]   Typically, the Court would have dismissed this type of amorphous complaint as a shotgun pleading. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (noting that a complaint is considered a shotgun pleading when it does "not separate each cause of action or claim for relief into a different count"). However, Defendants failed to file any motion demanding repleader. Moreover, the Court finds that it can in fact make out various causes of action from Plaintiff's complaint and has decided to delineate these causes of action for the sake of fairness and clarity. *See Kelly v. Wal-Mart Stores E., LP*, No. 3:18-CV-1492019 WL 1066065, at *1 (M.D. Ala. Feb. 15, 2019), *report and recommendation adopted,* No. 3:18-CV-149 2019 WL 1061663 (M.D. Ala. Mar. 6, 2019) (interpreting Plaintiff's complaint as setting forth claims of disparate treatment, failure to hire, lack of reasonable accommodation, and a hostile work environment under the ADA).

[9]   *See Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 191 (D.D.C. 2008) (noting and following the precedent of recognizing a separate claim as valid even when the plaintiff did not separately plead the count but nonetheless alleged facts amounting to a viable cause of action).

## A.     Counts I and II: Disability Discrimination

The ADA proscribes employers from discriminating against an employee on the basis of the employee's disability.  42 U.S.C. § 12112(a). In the Eleventh Circuit, ADA discrimination claims are analyzed under the burden-shifting analysis used for Title VII employment discrimination claims. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). The FCRA is similarly analyzed under the framework of Title VII disability discrimination cases. *Smith v. Naples Cmty. Hosp., Inc.*, 433 F. App'x 797, 799 (11th Cir. 2011) ("Because the FCRA is patterned after Title VII, courts generally apply Title VII case law to discrimination claims brought under the FCRA.") (citing *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004)); *accord Jones v. United Space Alliance, LLC,* 494 F.3d 1306, 1310 (11th Cir. 2007); *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998). To state a prima facie claim for disability discrimination, a plaintiff must establish three elements: (1) she is disabled,[10] (2) she was qualified[11] during the relevant time[12] and (3) the defendant discriminated against her because

---

[10]  Defendant does not challenge that Plaintiff is disabled. (Doc. 25, p. 10) ("For the purposes of this motion, Defendant concedes that Plaintiff is a person with a disability").

[11]  A "qualified individual" is defined under the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

[12]  Defendant does challenge whether Plaintiff was qualified at the relevant time, but the Court finds that Defendant cannot meet its burden for summary judgment on this element based on its own record: in Defendant's affidavit of Dr. Quillen, the record shows that, as of June 5, 2019, the Office of Institutional Equity—the entity that analyzed whether Plaintiff's request for a reduced patient load was in fact a reasonable accommodation—specifically noted that it "[left] open" the question of whether Plaintiff was a qualified individual, indicating a dispute of material fact on this issue, which accordingly must be left for the jury to resolve. (Doc. 26, p. 162).

of her disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).

Though not fully apparent until after subsequent briefing, Counts I and II of Plaintiff's Complaint seem to seek liability against Defendant under three different theories of discrimination: 1) disparate treatment of Plaintiff based on his disability, 2) a claim of a hostile work environment, and 3) a failure to provide reasonable accommodations for his disability in violation of 42 U.S.C. § 12112(b)(5)(A). (Doc. 2-1, ¶¶ 13–39). Defendant contends that Plaintiff cannot satisfy the third element of a prima facie claim under any theory. (Doc. 25, p. 2).

## 1.   *Disparate Treatment*

To show disparate treatment, Plaintiff must meet the burdens set forth in the *McDonnell Douglas* standard: first, Plaintiff must establish a prima facie case of discrimination; if Defendant is said to have articulated a legitimate, non-discriminatory reason for the adverse action, then Plaintiff must show that the reason is pretextual. *Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1278 (N.D. Ala. 2009). A showing of discriminatory disparate treatment requires Plaintiff to point to a "similarly situated" "comparator" from which he was treated differently. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258–59 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

The Eleventh Circuit maintains a high standard concerning how similar the comparator must be in order to make a showing of discrimination under a disparate treatment theory—that is, it must be "similarly situated in all material

respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019).The *Lewis* court was careful to delineate specific "sorts of similarities" that would constitute sufficient likeness, including similarities like a shared "disciplinary history" or "basic conduct (or misconduct)" in its analysis. *Id.* at 1227–28.

Defendant argues that Plaintiff fails to meet his burden because he does not adequately identify a comparator that is similar enough to meet standard that the Eleventh Circuit has imposed. (Doc. 25, p. 9). In response, Plaintiff asks this Court to depart from the Eleventh Circuit's standard. (Doc. 32, pp. 7–8). The Court, however, cannot make its determination based on whether it believes the Eleventh Circuit's demands for showing disparate impact are unreasonable. Accordingly, the Court must review the case before it within the parameters by which it is bound.

Here, Defendant correctly calls attention to the reality that no comparator exists in the record that is substantially similar enough to raise a disparate treatment claim. (*Id.* at p. 10). Plaintiff argues generally that "[m]any nondisabled residents got unsolicited patient complaints" as he did and that "one of the residents was fired from a rotation for unprofessionalism but was allowed to finish the residency program." (Doc. 32-1, p. 3). However, Plaintiff does not point to any other resident in the program with a demonstrably analogous record. Specifically, Plaintiff's performance, misconduct, and disciplinary history include the following: failing a training exam, being placed on two remediations for failing two separate rotations, receiving unsolicited patient complaints as well as negative

feedback from staff members concerning professionalism, and demonstrating unsatisfactory medical diagnostic performance in multiple patients. (Doc. 26, pp. 3–5; Doc. 27, pp. 2–7).

The Court sympathizes with Plaintiff in that it acknowledges he may well have been treated more harshly than his non-disabled counterparts; however, because there is no comparator in the record meeting the Eleventh Circuit's test, Plaintiff's disparate treatment claim necessarily fails. Consequently, Plaintiff has not met his burden to survive summary judgment with respect to a disparate treatment cause of action. Therefore, summary judgment is granted as to this cause of action.

### 2.   Hostile Work Environment

In contrast, Plaintiff makes a colorable claim of hostile work environment at this stage. While the Eleventh Circuit has not yet recognized a hostile work environment claim under the ADA, other circuits—as well as other courts in the Middle District of Florida—have ruled that such a claim is actionable under the ADA. *Phillips v. Harbor Venice Mgmt., LLC*, No. 8:19-CV-2379, 2020 WL 2735201, at *3 (M.D. Fla. May 26, 2020). Like the *Phillips* court, this Court will also "assume that a disability-based hostile work environment claim is actionable under the ADA. Furthermore, given their similar frameworks, this Court will evaluate [Plaintiff's] claim under the jurisprudence of Title VII." *Id.*

A hostile work environment claim requires that the Plaintiff make the following showings: (1) [he] belongs to a protected group (i.e., [he] is disabled

under the ADA); (2) [he] was subjected to unwelcome harassment; (3) the harassment to which [he] was subjected was based on a disability; (4) the harassment affected a term, condition, or privilege of [his] employment; and (5) the [supervising entity] knew or should have known of the harassment, but failed to take prompt, remedial action." *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1366 (S.D. Fla. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).

Further, the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). The issue of whether harassing conduct was "sufficiently severe or pervasive to alter the terms of conditions of his employment"—under the fourth element of this *prima facie* case—involves both an objective and a subjective component. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

### a.    *Member of a Protected Group*

As previously noted, Defendant concedes for purposes of this Motion that Plaintiff is considered disabled under the ADA. (Doc. 25, p. 10). Accordingly, this element is not in dispute.

### b.    *Unwelcome Harassment Based on a Disability*

Plaintiff here makes several statements in his sworn declaration that, collectively, defeat a motion for summary judgment concerning a hostile work

environment claim.[13] In his sworn declaration, Plaintiff avers that "the work environment was incredibly hostile" because he had to "work at a slower pace than [his] non-disabled colleagues and [his] supervisors constantly made [him] feel as if [he] was being assessed based on [his] speed." (Doc. 32-1, p. 2). Plaintiff also attests that his "[s]upervisors would yell at [him] in frustration and treat [him] as if [he] was intentionally not trying when in fact, [he] just work[s] slightly slower and was not afforded the accommodations [he] needed." (*Id.* at p. 3). He also states that, "[i]n general, [his] supervisors scrutinized [him] more heavily and treated [him] more poorly because of [his] disability." (*Id.*). Moreover, Plaintiff testifies that his "supervising physicians nitpicked at [his] every action, ultimately serving the purpose of harassment" (*Id.* at p. 5) and that "[d]uring an academic half day Dr. Sayre made [him] stand up in front of the entire residency program to talk about the dictation device as [his] accommodation" and that "[t]he residents belittled the need for [him] having to use one." (Doc. 32-2, p. 6).

Taking these claims as true, the Court finds that a material question of fact exists as to whether Plaintiff was in fact subject to unwelcome harassment relating to his disability. Plaintiff raises evidence of blatantly inappropriate unprofessionalism that relate directly to his disability at hand. Whether these

---

[13]   The Eleventh Circuit has recently held that even sworn, self-serving statements can defeat a claim for summary judgment. *United States v. Stein*, 881 F.3d 853 (11th Cir. 2018) ("The Court of Appeals, en banc, Jordan, Circuit Judge, held that in any civil case, including those in the realm of tax law, an affidavit which satisfies the federal civil procedure rule governing summary judgment may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated, overruling *Mays v. U.S.*, 763 F.2d 1295 [(11th Cir. 1985)].")

claims are refutable is not a matter for summary judgment but for the jury. Accordingly, the Court finds that summary judgment is not appropriate with respect to this element of Plaintiff's claim.

> c.   *The Severity and Effect of the Harassment, Defendant's Knowledge of the Harassment and Failure to Take Remedial Action*

Contemplating the aforementioned *Miller* factors, the Court finds that the severity and effect of the harassment that Plaintiff alleges should survive a summary judgment motion with respect to the fourth element of a hostile work environment claim. *Miller*, 277 F.3d at 1276.

### i.   Subjective Severity Component

Plaintiff presents sufficient evidence such that a triable issue of fact exists for the subjective component of experiencing harassment severe enough to alter his work conditions given that he felt compelled to take "a 3-month medical leave of absence due to the continued stress caused by the Defendant's failures to accommodate [his disability]." (Doc. 32-1, p. 4).  Defendant does not dispute Plaintiff's leave of absence. Accordingly, Plaintiff has done enough for the purpose of this Motion to show he experienced subjective emotional strife: his perceived need to remove himself from the program temporarily exemplifies the kind of subjective impact that satisfies this part of the *Miller* test.

### ii.   Objective Severity Component

Plaintiff also makes a sufficient showing of objective severity of harassment so as to defeat the Motion with respect to this element of the claim. The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). When assessing the "objective severity of the harassment, [a court] consider[s], among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. Repeated incidents of verbal harassment, notwithstanding a plaintiff's objection to them, rather than any specific number of comments, can serve as the basis for a harassment claim. *Id.* The Court reviews Plaintiff's claim in light of these factors.

Firstly, Plaintiff alleges that he was yelled at repeatedly and "constantly" made to feel as though he was being assessed on his speed. (Doc. 32-1, p. 2). Moreover, Plaintiff's testimony concerning his repeated requests for his dictation device and the public humiliation he experienced in terms of having to explain his accommodation to the entire residency program also tends to show a genuine dispute of material fact. Plaintiff attests that he made requests to several different supervising doctors "numerous times" concerning his dictation device but did not receive one until about a year later. (Doc. 32-2, pp. 3–4). Defendant does not

address this gap in time between Plaintiff's requests and actual receipt of his device. Plaintiff also attests that one of the doctors asked him why he needed this accommodation. (*Id.* at p. 4). Thus, Plaintiff puts forward evidence showing that the conduct to which he was subjected was particularly frequent.

Next, the Court finds that Plaintiff's testimony raises fact issues concerning whether a jury could find Defendant's conduct to be "[severe]" and "humiliating" *Miller*, 277 F.3d at 1276. When Plaintiff finally did receive his device, Dr. Sayre, one of the supervising doctors, purportedly made Plaintiff stand up in front of the entire residency program to address his dictation device as an accommodation, which resulted in the residents belittling him for needing to use one. (Doc. 32-2, p. 6). Again, Defendant fails to address this claim in any capacity. A reasonable jury could find that spotlighting Plaintiff's disability in a professional setting among a small group of colleagues could humiliate someone in an extreme way. Keeping in mind the fourth *Miller* factor, the Court finds that this kind of public scrutinization could also impact Plaintiff's performance in a way that was sufficient to "alter the terms of condition of his employment." *Miller*, 277 F.3d at 1276. Overtly singling out someone's disability among someone's non-disabled peers and forcing that disabled person to explain his condition to those peers could certainly have profound psychological effects on an individual—especially in a high-stakes, professional setting where each peer's performance is constantly being assessed and measured against one another. With reasonable inferences drawn in Plaintiff's

favor, a jury could find that this kind of treatment in the workplace, on top of Plaintiff's other claims of poor treatment, could have affected his performance.

Finally, Plaintiff submits evidence which creates a fact issue as to whether Defendant knew about the discrimination and failed to take sufficient efforts to remediate it accordingly. The Court finds Plaintiff's combination of offered facts to be telling: if Defendant in fact permitted Plaintiff to be yelled at and overly scrutinized him repeatedly and consistently because of his speed, ignored his requests for a device that would presumably assist Plaintiff with his performance given his disability, and then subsequently allowed Plaintiff to be ridiculed for receiving the help he requested, a reasonable jury could surely find that Defendant did not make sufficient efforts to remediate the harassment at hand.

Plaintiff also attests that "Dr. Lang sent out a program wide apology email to [him] regarding his treatment of [Plaintiff]." (Doc. 32-2, p. 6). Defendant does not address this email, nor does the Plaintiff provide the email in the record.  Taken as true and in the light most favorable to the non-moving party, the existence of this email potentially speaks both to Defendant's knowledge of the harassment as well as the extent of its efforts—or lack thereof—to remediate it. Without the full spectrum of evidence available to assess the severity of the alleged harassment as well as Defendant's reaction to it, the Court is obligated to find that there is a

genuine dispute of material fact as to the severity and pervasiveness of harassment as well as Defendant's efforts to remediate it here. [14]

Consequently, because a genuine dispute of material fact exists regarding each of the elements of Plaintiff's hostile work environment claim, summary judgment for this cause of action is due to be denied.

### 3.   Requests for Reasonable Accommodations

A claim for disability discrimination under the ADA includes situations where a defendant fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A). The burden is on the plaintiff to identify an accommodation and demonstrate that the accommodation allows her to perform the essential functions of the job. *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (per curiam). "[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly*, 492 F.3d at 1262 (emphasis in original).

The Court need not delve any further into a claim for failure to provide reasonable accommodations given Defendant's correct assertion that Plaintiff

---

[14] *See Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 199 (D.D.C. 2008) (denying defendant's summary judgment motion on a hostile work environment claim because the defendant's allegedly threatening emails in response to plaintiff's complaint to the EEOC were not produced and accordingly precluded the court from determining whether a reasonable person would find workplace hostility).

waived this claim by not pleading it in his complaint. In support of its argument, Defendant invokes *Cooley v. Great S. Wood Preserving*, 138 F. App'x 149, 153 (11th Cir. 2005), which the Court finds authoritative.

The *Cooley* court explicitly held that the plaintiffs' hostile work environment claim failed, despite sufficient factual allegations, because they did not raise this claim in their amended complaint, instead raising it for the first time in the briefing on a summary judgment motion. *Id.* After the defendant objected to this claim on the ground that "it was raised for the first time in the plaintiffs' brief opposing summary judgment," as was the case here, the plaintiffs argued that the defendant was not prejudiced by lack of notice, because they had alleged relevant facts in the amended complaint and subsequently uncovered additional facts in discovery. *Id.* The court rejected the plaintiffs' argument that no prejudice ensued from raising a previously unpled theory of liability at such a late stage in the proceedings. *Id.*

Plaintiff's case for allowing its reasonable accommodation claim to survive here is even more threadbare than the that of the *Cooley* plaintiffs. Plaintiff's Complaint alleges neither a reasonable accommodation claim, nor—unlike Plaintiff's other causes of action—does it allege any facts, plausibly interpreted, in support of said claim. (*See* Doc. 2-1). Indeed, Plaintiff did not elicit any facts supporting an inference of a reasonable accommodation claim until Plaintiff responded to Defendant's motion for summary judgment.[15]

---

[15] Plaintiff's delayed timing in raising this evidence obviates any potential argument that a motion to conform the evidence to the pleadings would be appropriate here because the Court agrees that this would in fact prejudice Defendant given Plaintiff's lack of providing notice.

Accordingly, the merits of a reasonable accommodation claim need not be analyzed. Given Plaintiff's lack of sufficient notice, the Defendant's Motion for Summary Judgment on reasonable accommodation is granted.

### B.    Counts III and VI: Retaliation

For the reasons set forth below, the Court finds that Plaintiff's retaliation claims under the ADA and FCRA are sufficient to withstand Defendant's summary judgment motion.

"To establish a prima facie case of retaliation pursuant to the ADA, a plaintiff must show that 1) she engaged in statutorily protected expression, 2) she suffered an adverse employment action, and 3) the adverse employment action was causally related to the protected expression." *Moore v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d 1291, 1305 (M.D. Fla. 2008); *Higdon v. Jackson,* 393 F.3d 1211, 1219 (11th Cir. 2004); *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir. 1999). "As with disability discrimination claims, retaliation claims brought under the FCRA are analyzed under the ADA framework." *Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019). The burden-shifting analysis applicable to ADA discrimination claims also applies to ADA retaliation claims. (*Id.*). A plaintiff must show that his participation in protected activity was a "but-for" cause of any adverse action. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d

---

*See Irwin Katz & Assoc., Inc. v. Concepts in Health, Inc.*, No. CV-13-1217, 2017 WL 593502, at *21 (D.N.J. Feb. 14, 2017) (noting that a motion to conform the evidence to the pleadings is inappropriate when the opposing party would be prejudiced and did not expressly or impliedly consent to said motion).

1265, 1277 (11th Cir. 2021). If a defendant meets its burden of showing a non-retaliatory reason for the adverse action, a plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Crucially, "the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision." *Borden v. Cheaha Reg'l Mental Health, Inc.*, No. 1:16-CV-0163, 2018 WL 1431648, at *10 (N.D. Ala. Mar. 22, 2018), *aff'd sub nom.*, 760 F. App'x 828 (11th Cir. 2019) (citing *McDonnell Douglas*, 411 U.S. at 802–05).

### 1.   *Engaging in Statutorily Protected Expression*

Plaintiff makes a sufficient showing of having engaged in statutorily protected expression to survive summary judgment. A showing of engagement in a statutorily protected expression may be met by a request for a reasonable accommodation as an element of a retaliation claim under the ADA.[16] 42 U.S.C. § 12203(a); *Frazier-White v. Gee*, 818 F.3d 1249 (11th Cir. 2016). Filing an EEOC charge can also be a form of engaging in statutorily protected expression. *Johnson*

---

[16] Even though Plaintiff failed to properly pled reasonable accommodation as an independent cause of action, there is sufficient evidence to support the request for reasonable accommodations as an element for a claim of retaliation.

*v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). Here, neither party disputes that Plaintiff made requests for reasonable accommodations or that he filed a charge with the EEOC. (Doc. 2-1, p. 5). Accordingly, Plaintiff has met his burden to survive summary judgment on this element of his retaliation claim.

## 2. *Suffering an Adverse Employment Action*

Plaintiff's testimony that he experienced an adverse employment action as defined by the ADA is also sufficient to withstand the Motion with regard to this element of his retaliation claims. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). A court should collectively consider the totality of actions that the plaintiff complains of rather than each action individually when determining the merits of an adverse employment action. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (holding that the plaintiff's complaints of adverse actions together rose to a level of adverse employment action under Title VII even though each one standing alone would have been insufficient to do so).

Here Plaintiff alleges that Defendant engaged in a series of actions that, taken together, could lead a reasonable jury to conclude that he experienced at

least one adverse employment action. For one, Plaintiff testifies that when he was placed on his first remediation in 2018 that he "was kept on remediation for six months and then put on probation" despite the policy that "remediations are supposed to be time-limited and are generally not supposed to exceed three months." (Doc. 32-1, p. 3). Defendant's action here followed Plaintiff's initial statutorily protected action of requesting accommodations. Plaintiff also subsequently requested a reduced patient load (which was shown not to be a reasonable accommodation) but instead shortly thereafter was met with the opposite: a higher patient load than he previously had, which was more than "any other resident . . . ." (Doc. 32-2, p. 6). Plaintiff states that Dr. Quiellen, the program director, told Plaintiff that he would require him to go above and beyond ACGME standards.[17] (Doc. 32-1, p. 4). Plaintiff additionally cites to an email he sent to his supervisors in which he states that he did not receive continual positive and/or negative feedback to assess his performance as was required by Defendant's policy. (*Id.* at pp. 20–21). There are times where one's silence speaks louder than words. The Court finds that Defendant's lack of feedback during this period, in connection with Plaintiff's allegation that his "first notice of failure to meet standards was when [he] received the failure notice [and second remediation] in July 2019" as well as the non-renewal of his contract just two months later, together constitute a dispute of material fact as to whether an adverse employment action was taken.

---

[17]   Defendant also does not address this claim in the record, so the Court accepts as true Plaintiff's assertion at this procedural stage.

*See, e.g.*, *Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 51 (S.D.N.Y. 2009); *see also McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 918 (N.D. Ohio 2010) (citing cases and finding "evidence in the record that the negative appraisals and performance plans supplied the necessary foundation for Plaintiff's eventual separation" sufficient to constitute adverse actions). Accordingly, Plaintiff has shown a dispute of material fact as to whether an adverse employment action as defined by the ADA was taken against him.

> 3. *Causal Connection: Legitimate, Non-Retaliatory Reasons Versus Pretext*

A material dispute of fact also exists regarding whether Plaintiff was terminated for legitimate, non-retaliatory reasons or whether those reasons were pretextual. The burden is on the plaintiff to show that the adverse employment decision was made because of intentional discrimination. *Borden*, 2018 WL 1431648, at *9. Showing a causal connection between protected activity and an adverse action requires no more than a demonstration that the two "were not wholly unrelated." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999). A causal connection is established if there is a close temporal proximity between the employer's awareness and the adverse employment action. *Roberts v. Rayonier, Inc.,* 135 F. App'x. 351, 358 (11th Cir. 2005) (citing *Farley,* 197 F.3d at 1337).

Defendant meets its burden of offering legitimate, non-retaliatory reasons for not renewing Plaintiff's contract, namely that Plaintiff demonstrated

incompetency in the pediatric ambulatory clinic on multiple occasions. (Doc. 2, p. 2; Doc. 25, pp. 2–4). Defendant makes showings that it believed Plaintiff performed poorly highlighting the facts that Plaintiff failed a training exam, was placed on two remediations for failing two separate rotations, received unsolicited patient complaints as well as negative feedback from staff members concerning professionalism, and demonstrated unsatisfactory medical diagnostic performance in multiple patients. (Doc. 26, pp. 3–5, Doc. 27, pp. 2–7).

Plaintiff, however, subsequently meets his burden of showing a material dispute of fact concerning whether these reasons were pretextual. After Plaintiff requested accommodations, Defendant placed him on a purportedly longer-than-usual remediation period that deviated from policy and possibly materially disadvantaged Plaintiff in terms of his conditions as an employee. (Doc. 32-1, p. 3). Secondly, the Court finds that there is a dispute of fact as to the reasoning behind why Defendant elected to increase Plaintiff's patient load to one that was higher than other residents' immediately after he requested an accommodation for a lower patient load. A reasonable jury could conclude that the temporal proximities between the requests and Defendant's reactions, respectively, demonstrate Defendant's potentially discriminatory motive in these instances.

Moreover, Defendant's failure to provide appropriate feedback toward the end of Plaintiff's employment just before the non-renewal of his contract raises an additional temporal concern that, in the context of Plaintiff's other cited evidence, sounds the Court's alarm. The Court finds that a jury could reasonably conclude

that Plaintiff was relieved of his position for legitimate or retaliatory reasons. Even putting Plaintiff's other allegations aside, these types of fact-based inquiries into credibility typify the circumstances under which summary judgment should not be granted. The merits of this claim are for the jury, and the jury alone. Summary judgment is due to be denied on the ground of retaliation.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED IN PART and DENIED IN PART.**

**DONE AND ORDERED** in Orlando, Florida on October 14, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record